**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OKLAHOMA**

IN RE:                                  )
                                        )      **Case No. 04-11677-R**
HALE-HALSELL CO.,                       )      **Chapter 11**
                                        )
                    Debtor.             )

**Filed / Docketed
December 8, 2006**

_____

SANDRA L. HAWK, PERSONAL        )
REPRESENTATIVE OF THE           )
ESTATE OF ROBERT D. HAWK,       )
SR., DECEASED, AND SANDRA L.    )
HAWK, INDIVIDUALLY,             )
                                )
                    Plaintiffs, )
                                )
v.                              )      **Adv. No. 06-1153-R**
                                )
HALE-HALSELL COMPANY,           )
THE F&M BANK & TRUST            )
COMPANY, and CITIZENS UNION     )
STATE BANK & TRUST f/k/a        )
MISSOURI STATE BANK & TRUST     )
COMPANY,                        )
                                )
                    Defendants, )
                                )
THE OFFICIAL COMMITTEE OF       )
UNSECURED CREDITORS OF          )
HALE-HALSELL COMPANY,           )
                                )
                    Intervenor. )

<u>**MEMORANDUM OPINION**</u>

Before the Court is the Motion for Summary Judgment and Brief in Support (Adv.

Doc. 50) filed by Defendant The F&M Bank & Trust Company ("F&M") on July 28, 2006

("F&M Motion"); Joint Response of Hale-Halsell Company and Creditors' Committee to

Motion for Summary Judgment of the F&M Bank and Trust Co. (Adv. Doc. 70) filed August 21, 2006; the Memorandum Response to the Defendant, The F&M Bank & Trust Company's Motion for Summary Judgment (Adv. Doc. 71) filed by Plaintiffs Sandra L. Hawk, Personal Representative of the Estate of Robert D. Hawk, Sr. (the "Hawk Estate") and Sandra L. Hawk individually ("Mrs. Hawk") on August 21, 2006 (the "Hawk Response"); the Reply of F&M Bank to Plaintiffs' Memorandum Response to F&M Bank's Motion for Summary Judgment (Adv. Doc. 85) filed on September 11, 2006 ("F&M Reply"); the Supplemental Response to the Defendant, The F&M Bank & Trust Company's Motion for Summary Judgment (Adv. Doc. 89) filed by the Hawk Estate and Mrs. Hawk on September 13, 2006 ("First Supplemental Response"); the Supplemental Response to the Defendant, The F&M Bank & Trust Company's Motion for Summary Judgment (Adv. Doc. 100) filed by the Hawk Estate and Mrs. Hawk on September 27, 2006 ("Second Supplemental Response"); and the Reply of F&M Bank to Defendants' [sic, should be "Plaintiffs'"] Supplemental Response to F&M Bank's Motion for Summary Judgment (Adv. Doc. 105) filed on October 6, 2006 ("Reply to Second Supplement").

## I.    Jurisdiction

The Court has jurisdiction of this "core" proceeding by virtue of 28 U.S.C. §§ 1334, 157(a), and 157(b)(2)(A), (B), (C), (K) and (O);  and Local Civil Rule 84.1(a) of the United States District Court for the Northern District of Oklahoma.

## II.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c), made applicable to this proceeding by Bankruptcy Rule 7056. "A fact is 'material' if under the substantive law it could have an effect on the outcome of the lawsuit."  Adams v. American Guarantee & Liability Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2000), *citing* EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1190 (10th Cir. 2000).  "An issue is 'genuine' if 'a rational jur[or] could find in favor of the nomoving party on the evidence presented."  Id., *quoting* Horizon, 220 F.3d at 1190.

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  See Spaulding v. United Transp. Union, 279 F.3d 901, 904 (10th Cir. 2002), *citing* Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out a lack of evidence for the other party on an essential element of that party's claim.  See Adams, 233 F.3d at 1246, *citing* Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671 (10th Cir. 1998).

Once the movant has met its initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."  Spaulding, 279 F.3d at 904, *citing* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Celotex, 477 U.S. at 324.

The nonmoving party may not simply rest upon its pleadings to satisfy its burden.  Liberty Lobby, 477 U.S. at 256.  Rather the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."   Mitchell v. City of Moore, 218 F.3d 1190, 1197-98 (10th Cir. 2000), *quoting* Adler, 144 F.3d at 671.  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." Adams, 233 F.3d at 1246.

"[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Liberty Lobby, 477 U.S. at 249.  Reasonable inferences that may be made from the proffered evidentiary record should be drawn in favor of the non-moving party.  See Adams, 233 F.3d at 1246.  However, "[i]f the [non-moving party's] evidence is merely colorable or is not significantly probative, summary judgment may be granted."  Liberty Lobby, 477 U.S. at 249-50 (citations omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587.  Conversely, even where a movant's facts are undisputed, if two reasonable factfinders could reach different conclusions or "ultimate inferences" from the  undisputed facts, summary judgment is not warranted.  See Luckett v. Bethlehem Steel Corp., 618 F.2d 1373, 1382 (10th Cir. 1980).

### III.     Contentions of the parties

In this adversary proceeding, the parties seek a determination as to who is entitled to the death benefits generated by two life insurance policies on the life of Robert D. Hawk, Sr. ("Mr. Hawk"), deceased, which were purchased by the debtor, Hale-Halsell Company ("Hale") prior to the bankruptcy.  Hale claims that the death benefits are assets of the bankruptcy estate, as Hale was the owner and named beneficiary of the policies.  F&M and the Official Committee of Unsecured Creditors (the "Committee") support Hale's assertion. F&M and another defendant, Citizens Union State Bank & Trust ("Citizens"), claim security interests in the proceeds, which neither Hale nor the Committee dispute.  Further, F&M does not dispute that Citizens has a security interest in the proceeds of one of the policies, and Citizens does not dispute that F&M has a security interest in the proceeds of the policies.

The Hawk Estate and Mrs. Hawk contend that prior to Mr. Hawk's death, Hale's insurable interest in the life of Mr. Hawk terminated which triggered an obligation on behalf of Hale to offer to sell, transfer or assign the policies to Mr. Hawk pursuant to 36 O.S. § 3604(A)(2) ("Section 3604(A)(2)").  Because Hale did not offer the policies to Mr. Hawk upon the alleged termination of Hale's insurable interest in Mr. Hawk's life, the Hawk Estate contends that (1) Hale should be compelled to tender the policies (or their proceeds) to the Hawk Estate in exchange for the cash value of the policies, if any, at the time Hale no longer had an insurable interest or (2) the Court should deem that a tender and assignment of the policies (and their proceeds) to the Hawk Estate has occurred by operation of law.  The Hawk Estate also claims that the security interests of F&M and Citizens attach only to the consideration (cash value) that Hale would receive from the Hawk Estate as a result of the

5

tender of the policies and proceeds to the Hawk Estate.  In the alternative, the Hawk Estate and Mrs. Hawk contend that the Court should reform the policies naming Mrs. Hawk as the beneficiary of the policies because it was Mr. Hawk's intention to name her as beneficiary upon the tender of the policies.  Amended Complaint (Adv. Doc. 49) at ¶¶ 11-14.  Further in the alternative, Mrs. Hawk individually claims an "equitable lien" on the proceeds of the policies, asserting that as beneficiary under a Senior Management Retirement Agreement entered into by Hale and Mr. Hawk (the "Retirement Agreement"), she is entitled to one-half of Mr. Hawk's monthly salary for 120 months, and that such obligation was to be funded by the life insurance policies.  Amended Complaint at ¶ 18.  As the named beneficiary under the Retirement Agreement, Mrs. Hawk also seeks a judgment for the benefits promised to Mr. Hawk in the Retirement Agreement regardless of whether she can establish an equitable lien on the proceeds.  Id. at ¶ 19.

F&M, Hale and the Committee contend Hale's insurable interest in Mr. Hawk's life did not terminate prior to his death, and therefore Hale never had an obligation to offer the policies to Mr. Hawk pursuant to Section 3604(A)(2).  These parties also argue that (a) in the Retirement Agreement, Mr. Hawk explicitly disclaimed any interest in the insurance policies, and therefore Hale had no obligation to offer the policies to Mr. Hawk pursuant to Section 3604(A)(2); (b) Mr. Hawk's consent to pledge the policies as collateral constitutes an agreement that obviated Hale's obligation to offer the policies to Mr. Hawk or the Hawk Estate pursuant to Section 3604(A)(2); (c) Mr. Hawk caused the policies to be procured on his own life for the benefit of Hale pursuant to 36 O.S. § 3604(A)(1), which renders Section 3604(A)(2) inapplicable; (d) the Hawk Estate's claim to the policies is inferior to the claims

of F&M by virtue of its prepetition liens and postpetition orders of this Court; and (e) Mrs. Hawk has no equitable lien on the policies or their proceeds.  In its Counterclaim, F&M asserts that the Court should determine that F&M's lien in the policies is superior to and takes priority over the claims of the Hawk Estate and Mrs. Hawk.  Answer to Amended Complaint and Counterclaim (Adv. Doc. 53) ("F&M Answer") at 3-4.

In its Motion, F&M seeks summary judgment in its favor on Count One of the Amended Complaint (claims to the proceeds of the policies pursuant to Section 3604(A)(2)), and a portion of Count Two (Mrs. Hawk's claim to an equitable lien in the proceeds), as well as summary judgment in its favor on its Counterclaim.  F&M does not seek judgment on the portion of Count Two in which Mrs. Hawk asserts a claim for benefits under the Retirement Agreement.  F&M is not a party to the Retirement Agreement, however, and therefore Mrs. Hawk does not state a cause of action against F&M with respect to seeking enforcement of the Retirement Agreement.

## III.    Undisputed material facts

The record supports the following undisputed material facts and reasonable inferences favorable to the non-movants from such undisputed facts.

Hale is an Oklahoma corporation that was involved in the wholesale grocery distribution business from its inception until approximately January 2004.  Hale also owned interests in various other businesses.  F&M Motion at 1, ¶ 1; Hawk Response at 1, ¶ 1.  At all relevant times, F&M was the principal secured lender to Hale.  F&M Motion at 2, ¶ 3; Hawk Response at 2, ¶ 3.  On March 22, 2004 ("Petition Date"), Hale voluntarily commenced a Chapter 11 bankruptcy case in this district and Hale's affairs have been

7

managed by Hale as a debtor-in-possession.  F&M Motion at 2, ¶¶ 4, 5; Hawk Response at

3, ¶¶ 4, 5.  On the Petition Date, Mr. Hawk was Chairman of the Board of Directors and

Chief Executive Officer of Hale.[1]  F&M Motion at 2-3, ¶ 6; Hawk Response at 3, ¶ 6.  Mr.

Hawk executed the Voluntary Petition requesting relief under Chapter 11, declaring under

penalty of perjury that the information provided in the Voluntary Petition was true and

correct, and that he had been authorized by Hale to file the Petition.  F&M Motion at 2-3, ¶

6; Hawk Response at 3, ¶ 6.  On March 22, 2004, Mr. Hawk, as Chairman and Chief

Executive Officer, signed the Statement Regarding Authority to Sign and File Petition that

provided that Mr. Hawk "is authorized and directed to appear in all bankruptcy proceedings

on behalf of the Corporation, and to otherwise do and perform all acts and deeds and to

execute and deliver all necessary documents on behalf of the Corporation in connection with

such bankruptcy case. . . ."   F&M Motion at 3, ¶ 7; Hawk Response at 3, ¶ 7.  On April 19,

2004, Mr. Hawk was Chief Executive Officer of Hale as indicated on the Declaration

Concerning Debtor's Schedules filed on April 19, 2004, and Mr. Hawk executed the Debtor's

Statement of Financial Affairs as Chief Executive Officer on April 19, 2004.  F&M Motion

at 3, ¶¶ 8, 9; Hawk Response at 3, ¶¶ 8, 9.

Mr. Hawk received his last paycheck from Hale on March 31, 2004.  Hawk Response

at 9, ¶ 4(b); F&M Reply at 3, ¶ 4(b).  Mr. Hawk did not participate in management of Hale

---

[1]The Second Amended and Restated Bylaws of Hale-Halsell Company dated May 20,
1999 (the "Bylaws") provide that "[t]he Chairman of the Board of Directors may serve as the
Chief Executive Officer of the Corporation and, while serving in that capacity, shall occupy
a position senior in authority to all other officers of the Corporation."  Section 5.04 of the
Bylaws, Hawk Response, Exh. K,  at 6.

after the Schedules were filed.  Hawk Response, Exh. C (testimony of Mr. Hawk), at 57; Hawk Response, Exh. D (testimony of Michael Owens), at 57; Hawk Response, Exh. L (testimony of Michael Owens), at 7-8; First Supplemental Response at 2, ¶ 2 (not controverted by F&M).   He was no longer paid for performing duties as Chief Executive Officer and he moved out of his office at Hale.  Hawk Response at 9-11; Hawk Response, Exh. F (testimony of Michael Owens), at 59-60.  After the bankruptcy was filed, only three employees continued to draw salaries from Hale:  Michael Owens, Russell Jobe and Linda Suvak; they have presided over the orderly liquidation of Hale's assets.  Hawk Response, Exh. F, at 59; Hawk Response, Exh. S (testimony of Michael Owen), at 68.  Although Mr. Hawk subjectively believed that the termination of his salary also indicated that he was no longer a director of Hale, there is no evidence that he had been removed from Hale's board of directors, nor did he submit a written resignation as director of Hale until after this Court determined (in a related contested matter) that Hale had an insurable interest in Mr. Hawk's life based in part upon his position as a director of Hale.

Prior to the bankruptcy, Mr. Hawk was also a director of United Super Markets of Oklahoma, Inc. ("United"), an entity in which Hale holds 50% of the stock.  Hawk Response, Exh. E, at 43-44.  United was Hale's primary customer.  Immediately prior to the bankruptcy, United ceased purchasing from Hale, which was one event that precipitated Hale's bankruptcy.   Again, although Mr. Hawk did not consider himself a director of United after the bankruptcy was filed "because they couldn't get United to talk to us" and because there were no directors' meetings, there is no evidence that he was removed from the United board or that he submitted a written resignation from the board until after the Court ruled that  Hale

9

maintained an insurable interest in Mr. Hawk's life based in part on his status of director of United.  Hawk Response, Exh. C, at 58; Exh. E, at 44.

Article III of Hale's Bylaws provides for the election of directors and for their terms, and states: "Each director shall hold office until the expiration of that director's term and until that director's successor is elected and qualifies or until that director's earlier death, resignation or removal."  Section 3.01 of the Bylaws.  Further, "directors, as such, shall not receive any stated salary for their services, . . . provided that nothing herein contained shall be construed to preclude any director from serving the Corporation in any other capacity and receiving compensation therefor."  Section 3.10 of the Bylaws.

The Transamerica Policy

At the commencement of Hale's bankruptcy case, Hale was the record owner of Life Insurance Policy No. 97000673 issued by Transamerica Occidental Life Insurance Company (the "Transamerica Policy") which insured the life of Mr. Hawk in the face amount of $4,500,000, and named Hale as beneficiary.  F&M Motion at 7, ¶ 28 and at 9, ¶ 42;  Hawk Response at 5, ¶ 28 and at 6, ¶ 42; Hawk Response, Exh. Q (Transamerica Policy).  On or about December 13, 2001, when the policy was issued, Mr. Hawk was Chairman of the Board and Chief Executive Officer of Hale.  F&M Motion at 7, ¶ 29; Hawk Response at 5, ¶ 29; Amended Petition, ¶ 9(b); F&M Answer, ¶ 9.  In the application for life insurance submitted to Transamerica, Hale indicated that the purpose of the policy was "Business: Keyperson, Stock Repurchase [and] Creditor."  F&M Motion at 8, ¶ 34; Hawk Response at 6, ¶ 34; Hawk Response, Exh. Q (Application attached to Transamerica Policy).  The application was signed by James O. Lewis, President, on behalf of Hale as the Owner, and

10

by Mr. Hawk as the Proposed Insured.  F&M Motion at 7, ¶ 33; Hawk Response at 6, ¶ 33; Hawk Response, Exh. Q.   The Transamerica Policy superceded two prior keyman life insurance policies owned by Hale.  F&M Motion at 9, ¶ 41; Hawk Response at 6, ¶ 41.

The Schedules executed by Mr. Hawk and filed with the Bankruptcy Court on April 19, 2004, showed "Transamerica Occidental Life Insurance Co. 97000673  - $524,960.26" as an asset of Hale's estate.  F&M Motion at 3, ¶ 10 (although the Hawk Estate disputes this allegation with legal argument, this is an accurate statement as to the content of the Schedules).  Hale paid all of the premiums due on the Transamerica Policy (an amount in excess of $1,000,000) and no premiums were paid by Mr. Hawk.  F&M Motion at 9, ¶ 39; Hawk Response at 6, ¶ 39.

Mr. Hawk died on March 29, 2006.  F&M Motion at 10, ¶ 48; Hawk Response at 7, ¶ 48.  A death benefit in the amount of $4,027,389.82 was paid by Transamerica to Hale, which, Hale deposited, pursuant to an Agreed Order Escrowing Life Insurance Proceeds (Adv. Doc. 63), into an interest-bearing escrow account pending further order of the Court. Status Report Regarding Proceeds of Transamerica Insurance Policy (Adv. Doc. 74) ("Status Report"), at 2 .

The Sun Life Policy

At the commencement of Hale's bankruptcy case, Hale was also the owner of Life Insurance Policy No. 020094614 (the "Sun Life Policy") issued by Sun Life Assurance Company of Canada ("Sun Life"), which insured the life of Mr. Hawk in the face amount of $5,000,000, and named Hale as beneficiary.  F&M Motion at 7, ¶ 30 and at 9, ¶ 43; Hawk Response at 5, ¶ 30 and at 7, ¶ 43; Hawk Response, Exh. R (Sun Life Policy).  On December

23, 2003, the date the Sun Life Policy was issued, Mr. Hawk was the Chairman of the Board

and Chief Executive Officer of Hale.  F&M Motion at 7, ¶ 29; Hawk Response at 5, ¶ 29;

Amended Petition, ¶ 9(a); F&M Answer, ¶ 9.  The Sun Life Policy replaced a prior policy

in the face amount of $5,000,000, which had been underwritten by Transamerica and had

been pledged to Citizens.  F&M Motion at 7, ¶ 31; Hawk Response at 5, ¶ 31.  In the

application for life insurance, Hale stated that the purpose of the policy was "Key Person"

insurance.  F&M Motion at 8, ¶ 36; Hawk Response at 6, ¶ 36.  The application was signed

by Robert Hawk, Jr., on behalf of Hale as Owner, and by Mr. Hawk as the Insured.  F&M

Motion at 8, ¶ 35; Hawk Response at 6, ¶ 35.  Hale has paid all of the premiums due on the

Sun Life Policy and its predecessor policies (an amount in excess of $1,000,000), and no

premiums were paid by Mr. Hawk.  F&M Motion at 9, ¶ 39; Hawk Response at 6, ¶ 39.

After Mr. Hawk's death, Sun Life paid Hale a death benefit in the amount of

$5,036,301.37, which Hale deposited in an interest-bearing escrow account pending further

order of this Court.  Status Report at 2.

The Senior Management Retirement Agreement

Hale and Mr. Hawk are parties to a Senior Management Retirement Agreement dated

May 20, 1999 (previously identified as the "Retirement Agreement").   The Retirement

Agreement contains the following provision:

> 11.  Funding.  The Company [Hale] reserves the absolute right at its
> sole and exclusive discretion either to fund the obligations of the Company
> undertaken by this Agreement or to refrain from funding the same, and to
> determine the extent, nature and method of such funding.  Should the
> Company elect to fund this Agreement, in whole or in part, through the
> medium of life insurance or annuities or both, the Company shall be the owner
> and beneficiary of any such policy.  The Company reserves the absolute right,

12

in its sole discretion, to terminate such life insurance or annuities, as well as any other funding program, at any time, either in whole or in part.  At no time shall the Management Employee be deemed to have any right, title or interest in or to any specified asset or assets of the Company, including, but not by way of restriction, any insurance or annuity contract or contracts or the proceeds therefrom.  Any such policy shall not in any way be considered to be security for the performance of the obligations of this Agreement.  It shall be, and remain, a general, unpledged, unrestricted asset of the Company.  If the Company purchases a life insurance or annuity policy on the life of the Management Employee, he agrees to sign any papers that may be required for that purpose and to undergo any medical examination or tests which may be necessary. This paragraph 11 shall not be construed as giving the Management Employee or his beneficiary any greater rights than those of any other unsecured creditor of the Company.

F&M Motion at 8, ¶ 37; Hawk Response at 6, ¶ 37; F&M Motion, Exh. U (Retirement Agreement).  The Retirement Agreement was maintained in the ordinary course of Hale's business in the business records, has not been rescinded, and remained in full force and effect on the Petition Date.  F&M Motion at 9, ¶ 38; Hawk Response at 6, ¶ 38.  The Sun Life Policy and the Transamerica Policy were acquired to fund Hale's obligations under the Retirement Agreement.  Hawk Response at 42, and Exh. W (testimony of Edward E. Packell), at 75-76; First Supplemental Response at 2, ¶ 3; First Supplemental Response, Exh. Z (testimony of Mrs. Hawk), at 56-58.

The Retirement Agreement further provides –

4.    <u>Payments Upon Retirement or Death After Age Sixty-Five (65)</u>.

*****

(c)   In the event Management Employee's employment is terminated by the Company without cause (as hereinafter defined) or Management Employee resigns under the circumstances described in paragraph 16(a)(ii)(A)

or (B),[2] Management Employee shall continue to receive the same compensation and benefits paid by the Company before such termination or resignation, including those he is entitled to receive under this Agreement, until Management Employee reaches the age of sixty-five (65). Upon reaching the age of sixty-five (65), Management Employee shall receive the benefits provided by this Agreement in the same manner as if Management Employee retired at age sixty-five (65) in accordance with paragraph 4. In the event of the death of Management Employee after his termination without cause or resignation under circumstances described in paragraph 16(a)(ii)(A) or (B), the provisions in paragraph 5 shall apply.

5.     <u>Death Before Age Sixty-Five (65)</u>.  If the Management Employee, before attaining the age of sixty-five (65) years, shall die while in the employ of the Company or while totally disabled as provided in paragraph 6 hereof, the Company agrees that, commencing with the first business day of the month following the month in which he dies, it will continue to pay an amount equal to one-half his basic monthly salary at the time of his death or becoming disabled for a period of 120 months, to his Beneficiary as provided in paragraph 9 hereof.

*****

9.     <u>Beneficiaries</u>.  The Management Employee shall have the right to designate a beneficiary ... who shall be entitled to receive payments provided for hereunder in the event of the Management Employee's death prior to payment in full of the benefits provided hereunder. . . .

*****

---

[2]Paragraph 16(a)(ii) of the Retirement Agreement provides events that would permit the Management Employee to voluntarily resign his employment prior to retirement without substantial loss of benefits. Subsection (ii) permits a Management Employee to resign within two years of "liquidation, dissolution, consolidation, reorganization, or merger of the Company" or "a breach of this Agreement by the Company," coupled with a "failure of the Company to . . . appoint the Management Employee to an office of responsibility and dignity equal to that in which the Management Employee is presently serving" or "other material change by the Company in the Management Employee's function, duties, compensation, or responsibilities which change would cause Management Employee's position with the Company to become of less dignity, responsibility, importance, or scope from the position and attributes thereof equal to that in which Management Employee is presently serving." Retirement Agreement, ¶ 16(a)(ii) and (iii).

12.   <u>Claims Procedure</u>.  In the event that benefits under this Agreement are not paid to the Management Employee (or his Beneficiary in the case of a Management Employee's death), and such person feels entitled to receive them, a claim shall be made in writing to the Board of Directors of the Company within sixty (60) days from the date payments are not made. . . . [The paragraph describes further procedures for review of claims].

*****

16.   <u>Payments to Management Employee Upon Termination of Employment</u>.

(a) Upon the occurrence of a Triggering Event (as hereinafter defined) during the period of Management Employee's employment under this Agreement and Management Employee's election to terminate his employment as provided herein, the provisions of this paragraph 16 shall apply.  As used in this Agreement, "Triggering Event" shall mean a termination or resignation described in subparagraphs (i) and (ii), respectively, following a event described in subparagraph (iii).

(i)   The termination [by the] Company of the Management Employee's full-time employment hereunder within two (2) years after the occurrence of any event specified in subparagraph (iii) of this paragraph (a) for any reason other than retirement . . ., disability . . ., or cause . . . ;

*****

(iii)   . . . [T]he event preceding a Triggering Event shall be (A) the liquidation, dissolution, consolidation, reorganization, or merger of the Company, . . . or (C) a breach of this Agreement by the Company. . . .

(b)  Upon . . . the termination by the Company of the employment of the Management Employee under circumstances as to cause such termination to constitute a Triggering Event, the Company shall pay the Management Employee (or in the event of his subsequent death, his beneficiary or representative as the case may be), at the election of the Management Employee, either (i) as severance pay or liquidated damages, or both, an amount equal to thirty-five (35) times the monthly average of the Includible Compensation of the Management Employee for the most recent five completed fiscal years of the Company preceding the fiscal year in which the applicable Triggering Event shall have occurred in a lump sum cash payment or in equal and consecutive monthly installments at the Management Employee's election or (ii) the payments payable upon retirement commencing

15

at age sixty-five (65) or thereafter in accordance with paragraphs 4 or 5 hereof, as the case may be. . . .

*****

18.   <u>Trade Secrets and Confidential Information</u>.   [Agreement by Management Employee to treat trade secrets and confidential information in a confidential manner as consideration in part for the benefits conferred by the Retirement Agreement]

19.   <u>Restrictive Covenant</u>. [Agreement by Management Employee not to compete with the Company prior to termination and for twenty-four months after termination]

*****

21.   <u>Binding Effect</u>.   This Agreement shall be binding upon the Management Employee and his surviving spouse . . . and upon the heirs, executors and administrators of the Management Employee and upon the Company, its successors and assigns.

22.   <u>Amendment</u>.  During the lifetime of the Management Employee this Agreement may be amended and revoked at any time or times in whole or in part by the mutual written agreement of the Management Employee and the Company.

Retirement Agreement, F&M Motion, Exh. U.  The Retirement Agreement was signed by James O. Lewis as President of Hale and Mr. Hawk as Management Employee.  Mr. Hawk designated Mrs. Hawk as his Primary Beneficiary pursuant to paragraph 9 of the Retirement Agreement, which provided him the right to designate a beneficiary "to receive payments provided for hereunder in the event of the Management Employee's death prior to payment in full of the benefits provided hereunder."  First Supplemental Response at 2, ¶ 4 (not controverted by F&M); Retirement Agreement and Exhibit A to Retirement Agreement, F&M Motion, Exh. U.

The Court takes judicial notice of the fact that as of the date of Mr. Hawk's death (and as of the date of this Memorandum Opinion), Hale had not assumed or rejected the Retirement Agreement.

<u>F&M's Claims to the Life Insurance Policies</u>

F&M filed various proofs of claim in Hale's bankruptcy case, asserting total secured debt in the amount of $9,379,965.47; after giving effect to all postpetition payments and credits, as of January 1, 2006, Hale owed F&M $2,941,740.30 plus interest.  F&M Motion at 3, ¶¶11, 12; Hawk Response at 3, ¶¶ 11, 12.  F&M's proofs of claim have been allowed as secured claims pursuant to the Joint Motion for Order Authorizing and Approving a Settlement Agreement Among and Between Git-N-Go, Inc., Hale-Halsell Company, 4 Front Petroleum, Inc., The F&M Bank & Trust Company, and Citgo Petroleum Corporation and Notice of Opportunity for Hearing (the "Settlement Motion").  F&M Motion at 4, ¶ 13; Hawk Response at 3, ¶ 13 (the Hawk Estate admits that F&M's  secured claims have been allowed).  The Settlement Motion provides that F&M has an Allowed Secured Claim against Hale in a specified amount which is secured by a security interest in, among other things, Hale's general intangibles and proceeds, and "[o]ther collateral held by F&M as shown on its Proof of Claim filed in the Hale-Halsell Bankruptcy Case. . . .  F&M's Allowed Secured Claim against Hale-Halsell shall not be subject to further dispute, claim of recovery, avoidance, objection, subordination, or disallowance of any kind."  F&M Motion at 4, ¶ 14 (although, in response to this statement, the Hawk Estate argues that F&M's security interest in the insurance policies is limited, the Hawk Estate does not controvert the quoted Settlement Agreement provision with any admissible evidence).

The Loan Agreement executed by Mr. Hawk on behalf of Hale (and on behalf of himself as Guarantor), effective April 9, 2003, states–

> 3.4   <u>Assignment of Life Insurance</u>.  Borrower shall assign or cause a second lien or assignment of Borrower's interest in certain life insurance policies on key executives as shown on Schedule 3.4. . . .

F&M Motion at 4-5, ¶ 15; Hawk Response at 4, ¶ 15; Loan Agreement, F&M Motion, Exh. I, ¶ 3.4 (although, in response to this statement, the Hawk Estate argues that F&M's security interest in the insurance contracts is limited, the Hawk Estate does not controvert the quoted provision with any admissible evidence).  Schedule 3.4 includes the Transamerica Policy as well as two other policies and an annuity issued by Transamerica on the life of Mr. Hawk and two Canada Life policies on the life of Mr. Hawk.  F&M Motion, Exh. I, Sch. 3.4.

The Security Agreement made effective as of April 9, 2003, provides –

> 1.2   <u>Certain Definitions</u>.   When used in this Security Agreement, the following terms shall have the respective meanings set forth following such terms:
>
> > "Collateral" shall mean: . . .
>
> > (g)   A second lien on life insurance in accordance with the Loan Agreement.

F&M Motion at 4-5, ¶ 15; Hawk Response at 4, ¶ 15 (although, in response to this statement, the Hawk Estate argues that F&M's security interest in the insurance contracts is limited to Hale's interest in the policies, the Hawk Estate does not controvert the quoted provision with any admissible evidence).

Notice of the Settlement Motion was provided to Mr. Hawk's counsel (and other interested parties) by the Bankruptcy Court's ECF Electronic Notice System and by United

States Mail on July 27, 2005. F&M Motion at 5, ¶¶ 16, 17; Hawk Response at 4, ¶¶ 16, 17.

Mr. Hawk did not object to the Settlement Motion.  F&M Motion at 5, ¶ 18; Hawk Response

at 4, ¶ 18.  On September 1, 2005, the Settlement Motion was approved by virtue of an order

granting the Settlement Motion (the "Settlement Order"), a copy of which was served on Mr.

Hawk's counsel.  F&M Motion at 5, ¶¶ 19, 20; Hawk Response at 4, ¶¶ 19, 20; F&M

Motion, Exh. L (the Settlement Order) and Exh. M (proof of service).  The Settlement Order

is a final order.

On December 2, 2005, Hale and the Committee filed a motion for order authorizing

the use of F&M's cash collateral to pay certain accrued administrative expenses.  F&M

Motion at 6, ¶ 21; Hawk Response at 4, ¶ 21.  The motion was served on Mr. Hawk's

counsel, and Mr. Hawk did not object to the motion.  F&M Motion at 6, ¶¶ 22-24; Hawk

Response at 4, ¶¶ 22-24.  The Court issued an order that reaffirmed the scope of F&M's

Allowed Secured Claim (as it was determined in the Settlement Motion), approved the use

of F&M's cash collateral for the purposes stated in the cash collateral motion, acknowledged

that Hale agreed to pay "the F&M Allowed Secured Claim . . . from proceeds of the first to

be received from the sale of liquidation of the interest of Hale-Halsell in capital stock of

United Supermarkets of Oklahoma, Inc. or any payment received by Hale-Halsell in

connection with life insurance policies on the life of Robert Hawk, Sr., whether by

assignment or death benefit claim, subject to prior existing liens, or other collateral of F&M,"

and approved the future distribution of such payments and proceeds to F&M.  F&M Motion

at 6-7, ¶ 27; Hawk Response at 5, ¶ 27; F&M Motion, Exh. Q (the "Cash Collateral Order"),

at 5, ¶ 11 and at 7 (the Hawk Estate does not dispute the content of the Cash Collateral

Order).  The Cash Collateral Order was served on Mr. Hawk's counsel.  F&M Motion, Exh.

R (proof of service).  The Cash Collateral Order is a final order.

<u>The Hawk Estate's Claims to the Insurance Policies</u>

If the Sun Life Policy and/or Transamerica Policies had been offered to Mr. Hawk or

the Hawk Estate at any time after Hale purportedly lost its insurable interest, Mr. Hawk and

the Hawk Estate would have been ready, willing and able to purchase the policies at their

cash surrender values.  First Supplemental Response at 2-3, ¶¶ 5-6 and 8-9 (not controverted

by F&M).

<u>Mr. Hawk's Guaranty</u>

On or about April 9, 2003, Mr. Hawk executed a written limited guaranty in which

he "absolutely, irrevocably and unconditionally" guaranteed prompt and full payment to

F&M of up to $4.5 million of the indebtedness owed by Hale to F&M, plus interest, costs

and fees thereon.  F&M Motion at 9, ¶ 44, and F&M Motion, Exh. V (the "F&M Guaranty");

Hawk Response at 7, ¶ 44 (the Hawk Estate admits that Mr. Hawk signed the F&M

Guaranty).  On July 30, 2004, F&M filed a Petition against Mr. Hawk in Tulsa County

District Court seeking to collect on the F&M Guaranty (the "<u>F&M v. Hawk</u> Litigation").

F&M Motion at 9, ¶ 45; Hawk Response at 7, ¶ 45; F&M Motion, Exh. W (Petition filed July

30, 2004).  The Hawk Estate contends that Mr. Hawk was not liable on the F&M Guaranty

based on various legal theories.  F&M has not received any amount from Mr. Hawk or the

Hawk Estate in satisfaction of any obligation under the F&M Guaranty.  F&M Motion at 10,

¶ 47; Hawk Response at 7, ¶ 47; F&M Motion, Exh. Y (Answer and Counterclaim filed by

the Hawk Estate on July 7, 2006).

<u>Hale's Claims Against Mr. Hawk</u>

On March 21, 2006, Hale filed a lawsuit against Mr. Hawk (and against other entities and directors of Hale, as well as former directors of Hale) in Tulsa County District Court, seeking (1) the avoidance of fraudulent transfers and preferential payments to entities owned or controlled by Mr. Hawk; (2) damages for alleged breaches of fiduciary duty by Mr. Hawk as a director of Hale, including wasting corporate assets, operating under a conflict of interest, self-dealing and effecting insider transactions, usurping a corporate opportunity, and for fraud and negligence; and (3) punitive damages.  Hawk Response at 10, ¶ 4(f); F&M Reply at 4, ¶ 4(f); Hawk Response, Exh. J (Petition).

<u>Mr. Hawk's (and the Hawk Estate's) Claims Against Hale</u>

Mr. Hawk filed a proof of claim against the Hale estate for indemnification in connection with the <u>F&M v. Hawk</u> Litigation.  Hawk Proof of Claim, Claim No. 562, filed August 30, 2004.  At that time, Mr. Hawk was also a party to six other lawsuits, and a target of threatened litigation by Git-N-Go, Inc., a subsidiary of Hale, all of which he contended arose on account of the fact that he was an officer or director of Hale, and for which he filed a claim against Hale's estate for indemnification pursuant to the Bylaws.  Included in his proof of claim was a claim for indemnification for fees and expenses incurred and any judgment rendered in <u>Dale Gross, *et. al* v. Hale-Halsell Company and Robert D. Hawk</u>, Case No. 04-CV-98-EA(M) (N.D. Okla.) (the "<u>Gross</u> Litigation"), in which former employees asserted WARN Act and ERISA claims against Hale and an ERISA claim against Mr. Hawk. <u>Id</u>.

The Bylaws provide:

Section 7.01.   Indemnification in Proceedings.   The Corporation shall indemnify any person who was or is a party or is threatened to be a party to any threatened, pending or completed action, suit or proceeding (including appeals), whether civil, criminal, administrative or investigative (other than an action by or in the right of the Corporation) by reason of the fact that he is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. . . .

Section 7.02.   Actions By or In Behalf of the Corporation.   The Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit (including appeals) by or in the right of the Corporation to procure a judgment in its favor by reason of the fact that he is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees) actually and reasonably incurred by him in connection with the defense or settlement of such action or suit if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Corporation and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable for negligence or misconduct in the performance of his duty to the Corporation unless and only to the extent that the District Court of the State of Oklahoma or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the district Court or such other court shall deem proper.

Section 7.03.   Mandatory Indemnification.   To the extent that a director, officer, employee or agent of the Corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in Sections 7.01 and 7.02 of this ARTICLE VII or in defense of any claim, issue or matter therein, he shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him in connection therewith.

*****

Section 7.08.   <u>Rights Continue</u>.   The indemnification provided by this ARTICLE VII shall apply to acts and transactions occurring heretofore or hereafter and shall not be deemed exclusive of any other rights . . . and shall continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

Bylaws, Hawk Response, Exh. K, at 9-10.

<u>The Gross Litigation</u>

Hale and Mr. Hawk filed separate motions for summary judgment in the <u>Gross</u> Litigation. On September 15, 2006, after Mr. Hawk's death, the District Court granted judgment in Mr. Hawk's favor, holding that Mr. Hawk was not a fiduciary of Hale's employee benefit plan for ERISA purposes.  Second Supplemental Response, ¶ 1; Reply to Second Supplement, ¶ 1; Opinion and Order attached to Second Supplemental Response ("District Court Order") at 13.  In addition, the District Court granted judgment in Hale's favor on the WARN Act claim, based in part upon Mr. Hawk's deposition testimony regarding his conversations and transactions with agents of United in connection with United's termination of its vendor/vendee relationship with Hale, which supported Hale's "unforeseen business circumstances exception" to the notification requirements of the WARN Act.  District Court Order at 3, 19; Reply to Second Supplement, Exh. B (partial transcript of 2004 Exam of Robert Hawk, Sr. attached to Hale's Motion for Summary Judgment).

<u>Mr. Hawk's Resignations</u>

On March 15, 2006, at a hearing held in connection with Hale's motion to approve a proposed sale of the Transamerica and Sun Life policies and Mr. Hawk's objection thereto

based upon his contention that Hale's interest in the policies was encumbered by Mr. Hawk's option to purchase the policies under Section 3604(A)(2), this Court determined that Hale had an insurable interest in the life of Mr. Hawk based *in part* upon his positions as officer and director of Hale and United, and therefore held that the "right of first refusal" provision of Section 3604(A)(2) could not be invoked by Mr. Hawk.  Transcript of Hearing of March 15, 2006, Main Case Doc. 1370, at 96-99.  On March 17, 2006, Mr. Hawk sent Hale a letter resigning his positions as "officer, director, chairman, CEO, employee, consultant or any other 'label' that might be attached or associated with my name and any of the above listed companies effective May 1, 2004."  Hawk Response at 10, ¶ 4(e); F&M Reply at 4, ¶ 4(e); Hawk Response, Exh. H ("Hale Resignation Letter").  On March 17, 2006, Mr. Hawk also mailed a letter to United, resigning as director of United (and any other positions he might have held) effective May 1, 2004.  Hawk Response at 10, ¶ 4(e); F&M Reply at 4, ¶ 4(e); Hawk Response, Exh. I ("United Resignation Letter").[3]

_____

[3]In light of the existence of sufficient undisputed facts from which the Court can conclude that Hale retained an insurable interest in Mr. Hawk's life until his death, certain facts asserted by the Hawk Estate in its "Statement of Additional Relevant Facts" that are disputed by F&M do not preclude summary judgment because they are not material.   See Hawk Response at 7-14 ("Statement of Additional Relevant Facts").   These include Statement of Additional Relevant Facts ¶¶ 4(h), 4(i), 4(k), 7, a portion of 8 (cash surrender value),11(allegation that Citizens claims ownership of the Sun Life policy, but the Hawk Estate disputes the claim) and 12.  The Hawk Estate and Mrs. Hawk also asserted additional facts in the First Supplemental Response ("Supplemental Facts") that are not material including paragraphs 7 and 10 (regarding offers of third parties to purchase the policies and cash surrender values).

In addition, in its Statement of Additional Relevant Facts, the Hawk Estate alleges certain statements that are legal conclusions rather than facts and therefore were not considered for the purpose of determining whether any disputed material facts exist.  These include Statement of Additional Relevant Facts ¶¶ 1, 2, 3, 4 (however, subparagraphs 4(a) through 4(f) and part of 4(g) have been deemed undisputed by virtue of the uncontroverted

## IV.    Conclusions of law

### A.    Count One – The Hawk Estate's Claim under Section 3604(A)(2)

The threshold question, and one that is dispositive of the claims of the Hawk Estate, is whether Hale's insurable interest in the life of Mr. Hawk terminated before his death.[4]  The Hawk Estate asserts that at some point before Mr. Hawk died, Hale's insurable interest on Mr. Hawk's life terminated, which purportedly obligated Hale to offer to sell the policies to Mr. Hawk for their cash value under the provisions of Section 3604(A)(2), which states–

> In the absence of an agreement to the contrary, [with respect to] a policy procured and owned by a corporation, partnership, association, limited liability company, or other legal entity on the life or body of an officer, director, manager, member, or employee, other than a sole proprietor, upon the termination of the insurable interest, the owner of the policy shall, if permitted by the terms of the policy, offer to sell, transfer, or assign the policy to the insured in exchange for the cash surrender value of the policy or, if there is no cash value, in exchange for an amount equal to the total of any premiums paid for the policy, minus any dividends received, plus interest. This offer shall be made in writing to the insured after termination of the insurable interest. The offer shall state the time for acceptance which shall not be less than thirty (30) days after receipt of the offer by the insured. If the insured rejects the offer or

---

documentary evidence cited in support thereof), a portion of 4(g) (that "Hale "does not receive any benefit from Robert D. Hawk, Sr. for which he is named as a co-defendant in a lawsuit along with Hale . . ."), 4(j), and a portion of 8 (that Hale's insurable interest terminated and that Hale had obligations under Section 3604(A)(2)).

Paragraph 9 of the Hawk Estate's Statement of Additional Relevant Facts, which refers to the treatment of the Retirement Agreement in the Committee's proposed plan of liquidation, was disregarded due to the elimination of the language quoted therein when the Committee amended its plan.  See Hawk Response at 13; Main Case Doc. 1679 (Third Amended Plan of Liquidation).  Paragraph 12 of the Supplemental Facts was disregarded because the Hawk Estate attempted to incorporate by reference their entire Response and Objection to Citizens Union Bank & Trust's Motion for Summary Judgment, which violates Local Rule 7056(b).

[4]Mrs. Hawk's claims are not dependent upon resolution of the issue of Hale's insurable interest; rather, her claims arise under the Retirement Agreement.

fails to accept the offer in the time provided, the owner of the policy may continue to own the policy subject to its terms.

36 O.S. § 3604(A)(2).  As the party claiming that Hale's insurable interest terminated and as the party seeking enforcement of Section 3604(A)(2), the Hawk Estate has the burden of proving the termination of Hale's insurable interest.

Section 3604(C) of title 36 of the Oklahoma Statutes defines "insurable interest with respect to personal insurance" as follows:

"Insurable interest" with reference to personal insurance includes only interests as follows:

1.      In the case of individuals related closely by blood or by law, a substantial interest engendered by love and affection;

2.      In the case of other persons, a lawful and substantial economic interest in having the life, health, or bodily safety of the individual insured continue, as distinguished from an interest which would arise only by, or would be enhanced in value by, the death, disability or injury of the individual insured;

3.      [Provides that parties to a buy-sell agreement of partnership interests or stock in a close corporation have insurable interests in each other]; and

4.      a.  An employer, or a trust which is sponsored by an employer for the benefit of its employees, shall have an insurable interest in each of the lives of the employees, directors or retired employees of the employer.   Notwithstanding paragraph 2 of subsection C of this section or Section 4101 of this title,[5] and amendments thereto, the employer or trust may insure the life of any employee, director or retired employee for the benefit of the employer or trust on an individual or group basis only with the written consent of the insured.

---

[5]Section 4101 of title 36 regulates "group life insurance" and is not applicable in this case.

b.  The consent requirement of Section 3607 of this title shall be accomplished as follows:

(1) the employer shall notify the employee, director, or retired employee by a written notice that the employer or trust would like to obtain life insurance coverage with respect to the person's life, and

(2) if the employee, director, or retired employee fails to provide written consent to the employer or trust, the employer or trust shall not purchase or obtain such insurance.

*****

f.  This section shall not be interpreted to limit other insurable interests which may exist by statute or at common law.

g.  Determination of the existence and extent of the insurable interest under any life insurance policy shall be made at the time the contract of insurance becomes effective, provided however, the insurable interest need not exist at the time the loss occurs.

36 O.S. § 3604(C).

It is undisputed that Mr. Hawk's status as Chairman of the Board and Chief Executive Officer of Hale established Hale's insurable interest in Mr. Hawk's life at the time the policies were issued and on the Petition Date.[6]  It is undisputed that Hale terminated Mr.

───────────────

[6]"It is widely accepted that corporations have an insurable interest in . . . key employees."  Tillman v. Camelot Music, Inc., 408 F.3d 1300, 1305 (10th Cir. 2005).  "Examples of key employees include presidents, officers, principal stockholders (if important to the success of the business), directors, large stockholders who serve as directors, managing vice presidents, secretaries and general managers, treasurers, and branch managers."  Id. at 1305, n.2, citing LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE ("COUCH") § 43:15 (3d ed. 1995).  The Court in Tillman also acknowledged that Oklahoma recognized that a close economic association between the insured and another person or entity provides

Hawk's salary immediately after the bankruptcy was filed in March 2004, and that after Mr. Hawk executed the Schedules and Statement of Financial Affairs on behalf of Hale in April 2004, he had no further involvement in the operation or management of Hale. For the purpose of considering F&M's motion for summary judgment, the Court must draw the inference in favor of the Hawk Estate that Mr. Hawk ceased to be the Chief Executive Officer of Hale after he signed the Schedules and Statement of Financial Affairs.

However, prior to the Petition Date, Mr. Hawk was a director of Hale, as well as a director of United. Although Mr. Hawk may have subjectively believed that he had been "fired" as a director of Hale and of United, the Hawk Estate presented no evidence that he had been removed as a director by the shareholders of Hale or United.[7] Oklahoma corporate law provides that although a director may resign at any time, a unilateral resignation (*i.e.*, one not requiring acceptance by the board to be effective) must be in writing. See 18 O.S. § 1027(B) ("Each director shall hold office until a successor is elected and qualified or until his or her earlier resignation or removal. Any director may resign at any time upon notice given in writing or by electronic transmission to the corporation.").[8] Approximately two

the person or entity an insurable interest in the life of the insured, even in the absence of an employer/employee relationship. Id. at 1305, *citing* Hulme v. Springfield Life Ins. Co., 565 P.2d 666 (1977).

[7]Directors "may be removed, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of directors. . . ." 18 O.S. § 1027(H)(1). Moreover, Mr. Hawk was not entitled to assume that he was no longer a director based on the termination of his salary because the Bylaws provided that directors served without compensation. Section 3.10 of the Bylaws.

[8]This statute is substantively identical to the General Corporation Law of Delaware § 141(b). Courts have held that the purpose of this provision is (1) to provide a director a means of unilaterally resigning, that is, without seeking acceptance of the resignation by the

weeks before his death, and two days after the Court ruled that Hale maintained an insurable

interest in Mr. Hawk's life based in part upon Mr. Hawk's status as a director of Hale and

United, Mr. Hawk executed the Hale Resignation Letter and the United Resignation Letter,

purporting to resign as director retroactively to May 2004.  The effectiveness of Mr. Hawk's

resignations is in considerable doubt, because a director's right to resign is qualified by his

or her fiduciary duties to shareholders, or to creditors when the corporation is insolvent, and

is invalid as against public policy if the resignation is motivated by pecuniary consideration

that results in the betrayal of the director's fiduciary duties.   See 2 FLETCHER CYCLOPEDIA

---

corporation, "to prevent a corporate director who desired to resign from having his status placed in doubt by a refusal or failure of the Board to act."  Dillon v. Berg, 326 F. Supp. 1214, 1223-24 (D. Del. 1971), aff'd 453 F.2d 876 (3d Cir. 1972).  However, "it can also be inferred that it was the policy of this legislation that a resignation be unequivocal, in writing, and that it be communicated to the corporation.  The necessity for written notice to the corporation before a director's resignation becomes effective clearly indicates an intent to outlaw secret, covert resignations in order to enable the other directors to know at all time the status of their fellow directors.  Therefore, the Court interprets the phrase 'written notice to the corporation,' used in 8 Del.C. § 141(b) in connection with the resignation of a director, to mean actual written notice to each and every member of the Board of Directors or actual written notice to an agent of the corporation, such as its Chairman of the Board, President, or Secretary."  Id. at 1224.  See also Rare Earth, Inc. v. Hoorelbeke, 401 F. Supp. 26, 31-32 (S.D.N.Y. 1975) (interpreting similar provision of Michigan corporate law).  Cf. Wylie v. Marley Co., 891 F.2d 1463 (10th Cir. 1989) (holding that a corporation seeking to prove that a corporate officer/director repudiated his employment contract was not precluded from presenting evidence that such officer/director orally communicated his resignation to the board; the Court interpreted the Kansas statute to mean that a writing was not mandatory "if the officer intends to resign and does state his intention to the corporation" and that the statute "does not preclude a director from resigning orally, but an oral resignation may not be effective until its acceptance by the board on behalf of the corporation").

          In this case, the Hawk Estate contends that Mr. Hawk had been "fired" from the board (without presenting any evidence that the shareholders had taken any action to remove him). The Hawk Estate does not contend that Mr. Hawk "orally" resigned from the board, and it presented no evidence that Mr. Hawk ever orally communicated to Hale or to United that he intended to or did resign as director of Hale or United.

OF THE LAW OF CORPORATIONS ("FLETCHER") §§ 345, 348; 4 NORTON BANKRUPTCY LAW

& PRACTICE 2D § 77:7.[9]  Moreover, because a corporate director may not secretly resign–that

is, may not resign without giving unequivocal notice to the corporation– Mr. Hawk's

resignation, if effective at all, occurred on the date he notified Hale and United in writing.

Thus, Mr. Hawk was a director of Hale, and consequently, Hale had an insurable interest in

Mr. Hawk's life, until at least two weeks before his death based upon his status as a director.

See 36 O.S. § 3604(C)(4)(a).

Moreover, Hale's obligations to Mr. Hawk under the Retirement Agreement, which

at the time of Mr. Hawk's death had not been rejected by Hale and therefore was viable and

enforceable,[10] establish that Hale retained an insurable interest in Mr. Hawk's life until his

---

[9]The Court could infer from the evidence (*i.e.*, the proximity in time of Mr. Hawk's resignation as a director to the Court's determination of Hale's insurable interest based in part on Mr. Hawk's status as a director) that Mr. Hawk submitted the Hale Resignation Letter and United Resignation Letter for the purpose of claiming an entitlement to purchase, for minimal consideration, insurance policies for which Hale paid millions of dollars in premiums, and that such conduct was a breach of Mr. Hawk's fiduciary duty to Hale (*i.e.*, for competing with Hale for ownership and control of a valuable corporate asset or a corporate opportunity), and further conclude that the written resignations were invalid. See, e.g., Federal Kemper Life Assurance Co. v. Wolensky's L.P (In re Wolensky's L.P.), 163 B.R. 615, 622-24 (Bankr. D. D.C. 1993); 3 FLETCHER § 837.50 ("If a director places himself . . . in a position in which the director may be tempted, by the director's own private interest, to disregard [the interest] of the corporation, the transactions are voidable at the option of the corporation and may be set aside without a showing of actual injury").

However, drawing all inferences in favor of the Hawk Estate, as it must, the Court cannot make such a finding on summary judgment.  In light of the existence of additional undisputed bases upon which Hale possessed an insurable interest in Mr. Hawk at the time of his death, however, the fact that Mr. Hawk may not have been a director at the time of his death does not  preclude summary judgment in favor of F&M.

[10]In a chapter 11 case, unless otherwise ordered by the court, the debtor in possession may assume or reject an executory contract "at any time before the confirmation of a plan." 11 U.S.C. § 365(d)(2).  Even if Hale ultimately rejects the Retirement Agreement in its Plan, it was a valid and enforceable contract at the time of Mr. Hawk's death.  In any event,

death.   It is undisputed that the life insurance policies were acquired to fund Hale's

obligations under the Retirement Agreement and that Mr. Hawk consented to funding Hale's

obligations under the Retirement Agreement by purchasing insurance on his life.   In fact,

Mrs. Hawk now asserts a claim to the benefits that were due to Mr. Hawk under the

Retirement Agreement.   Under the Retirement Agreement, upon termination of his salaried

employment in March or April 2004, Mr. Hawk was arguably entitled to certain

compensation and benefits under the Retirement Agreement similar to compensation and

benefits of an "employee" until age 65, and certain other compensation and benefits as a

"retired employee" thereafter.   Even if he was no longer an active and productive "employee"

upon his termination, an arguable entitlement to benefits under the Retirement Agreement

rendered him a "retired employee."   Under Oklahoma law, an employer has an insurable

interest not only in its managers, directors and active employees, but also in its retired

---

rejection would not invalidate the Retirement Agreement, but rather would affect the priority
of any claim for benefits thereunder by deeming a breach of the contract to have occurred
prepetition. See 11 U.S.C. § 365(g)(1) ("the rejection of an executory contract . . . constitutes
a breach of such contract . . . immediately before the date of the filing of the petition") and
§ 502(g) ("a claim arising from the rejection . . . of an executory contract . . . shall be allowed
. . . or disallowed . . . the same as if such claim had arisen before the date of the filing of the
petition").

    Further, neither party presented any evidence that Hale and Mr. Hawk mutually
revoked the Retirement Agreement in writing pursuant to paragraph 22 of the Retirement
Agreement.

employees.  See 36 O.S. § 3604(C)(4)(a).[11]  At all times before his death, Mr. Hawk fell within at least one of those categories.

In addition, the financial fates of Hale and Mr. Hawk were intrinsically intertwined, regardless of whether Mr. Hawk continued to be employed by Hale.  Mr. Hawk was never a "rank and file employee."  For many years prior to Hale's bankruptcy, Mr. Hawk was Hale's Chief Executive Officer and Chairman of the Board.  Mr. Hawk was in control of a significant percentage of Hale's stock.  Mr. Hawk's personal historical knowledge of Hale's transactions with creditors, vendors and employees was valuable to Hale.  For instance, Mr. Hawk's testimony was cited in support of summary judgment that was granted in Hale's favor and in Mr. Hawk's favor in the Gross Litigation in which former employees sued Hale and Mr. Hawk for alleged violations of the WARN Act and ERISA.  After Mr. Hawk's death, summary judgment was granted in favor of Hale on the WARN Act claim and in favor of Mr. Hawk on an ERISA claim based in part on Mr. Hawk's deposition testimony.  Had summary judgment not been granted, Hale would have required Mr. Hawk's testimony in presenting its defense at trial.

---

[11]"The insurable interest of the employer or trust in . . . retired employees shall be limited to an amount agreed to by the employee . . ." or if there is no agreement, an amount that would cover the aggregate projected retirement benefits for which the employer would be liable. 36 O.S. § 3604(C)(4)(d).  "Determination of the existence and extent of the insurable interest under any life insurance policy shall be made at the time the contract of insurance becomes effective, provided however, the insurable interest need not exist at the time the loss occurs."  36 O.S. § 3604(C)(4)(g).  As evidenced by his signature on the policy applications, Mr. Hawk consented to Hale obtaining the two policies in the amounts provided therein at the time the policies became effective.

Further, Mr. Hawk's successful defense of the ERISA claim against him was valuable to Hale because it allowed Hale to avoid potential obligations to indemnify Mr. Hawk against an adverse judgment.  Notwithstanding the termination of his management role by Hale, Mr. Hawk continued to claim rights of indemnification granted under the Bylaws.  The Bylaws state–

> The indemnification provided by this ARTICLE VII shall apply to acts and transactions occurring heretofore or hereafter and shall not be deemed exclusive of any other rights . . . and shall continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

Section 7.08 of the Bylaws, Hawk Response, Exh. K, at 10.  Hale had a significant economic interest in procuring Mr. Hawk's assistance not only in defending third party claims against Hale and in prosecuting Hale's claims against third parties, but also in Mr. Hawk's successful defense of claims against him that potentially triggered indemnification liability on behalf of Hale.  Clearly, as a crucial repository of institutional knowledge, Mr. Hawk's life, health, and bodily safety had an economic value to Hale sufficient to confer an insurable interest in favor of Hale until all third-party claims against Hale and Mr. Hawk, as well as causes of action asserted (or to be asserted) by Hale against third parties, were resolved.[12]

---

[12]Because Hale and Mr. Hawk were jointly obligated on $4.5 million of the debt to F&M, it is possible that the F&M Guaranty also created an insurable interest in favor of Hale, since it was in Hale's interest to have its debt to F&M paid.  See Maderios v. Savino, 418 A.2d 839 (R.I. 1980) (principal obligor has an insurable interest in the life of its surety); 3 COUCH § 43:22 ("Co-obligors, who are jointly and severally bound on an obligation, have an insurable interest in the lives of each other, at least, 'to the extent of the suretyship' or debt.").  However, to the extent that Mr. Hawk might have paid Hale's debt to F&M, Mr. Hawk would likely have asserted a right to subrogation in order to "step into the shoes" of F&M as a secured creditor of Hale.  In the event Mr. Hawk was entitled to subrogation, Hale could conceivably have had defenses or setoff rights against Mr. Hawk with respect to claims

Because the Court must conclude from undisputed facts that Hale's insurable interest in Mr. Hawk's life continued until his death, the Court need not, and does not, determine (1) whether certain provisions in the Retirement Agreement constituted an "agreement to the contrary" that rendered Section 3604(A)(2) inapplicable; (2) whether Mr. Hawk waived rights under Section 3604(A)(2) in the Retirement Agreement; (3) whether Mr. Hawk's original consent to Hale's acquisition of the policies constituted an "agreement to the contrary" that rendered Section 3604(A)(2) inapplicable; (4) whether Mr. Hawk's consent to pledge the policies constituted an "agreement to the contrary" that rendered Section 3604(A)(2) inapplicable; (5) whether Mr. Hawk was estopped from claiming rights under Section 3604(A)(2); (6) whether the provisions of Section 3604(A)(2) are preempted by the Bankruptcy Code;[13] (7) whether lenders, such as F&M and Citizens, whose claims are secured by life insurance policies, have obligations under Section 3604(A)(2) and whether such security interests are subject to, or subordinate to, an insured's rights under Section 3604(A)(2); (8) whether the Hawk Estate was precluded from challenging F&M's security

_____

Hale has asserted against Mr. Hawk.  Thus, the Court declines to rely upon the F&M Guaranty as a source of Hale's insurable interest in Mr. Hawk, as establishing that the F&M Guaranty would have conferred an economic benefit on Hale requires far-reaching speculation as well as the resolution of various complex legal issues that need not be addressed herein.  The existence of the F&M Guaranty further establishes Hale's and Mr. Hawk's economic interdependence, however.

[13]In declining to consider whether Section 3604(A)(4) is preempted by the Bankruptcy Code, the Court need not address the Hawk Estate's novel argument in opposition to preemption that the death benefits paid under the policies are not property of Hale's bankruptcy estate.  See Hawk Response at 36-39.  Because neither the Hawk Estate nor Mrs. Hawk owned the policies and neither were beneficiaries of the policies, the Hawk Estate's proposition that the death benefits are not property of Hale's estate does nothing to advance their claims to such benefits.

interest in the policies under the doctrine of collateral estoppel; and (9) whether Mr. Hawk's purported resignations were transactions outside the ordinary course of business that required Bankruptcy Court approval.

### B.    Count Two - Mrs. Hawk's Equitable Lien Claim

With respect to Mrs. Hawk's claim to an equitable lien on the policies and their proceeds, the contract under which Mrs. Hawk claims benefits, the Retirement Agreement, expressly provides that if benefits under the agreement are to be funded by insurance, "[a]ny such policy shall not in any way be considered to be security for the performance of the obligations under this Agreement."   Retirement Agreement at ¶ 11.   In addition, the Retirement Agreement provides that at no time shall Mr. Hawk (or anyone claiming under him) "be deemed to have any right, title or interest in or to any specified asset or assets of the Company, including . . . any insurance or annuity contract or contracts or the proceeds therefrom."   Id. at ¶¶ 11, 21 (binding effect).   Further, "[t]his paragraph 11 shall not be construed as giving the Management Employee or his beneficiary any greater rights than those of any other unsecured creditor of the Company."   Id. at ¶ 11.   The Retirement Agreement could not be more clear in expressing that neither the Hawk Estate nor Mrs. Hawk could or should expect that benefits under the Retirement Agreement would be paid from the proceeds of any insurance policy.   Accordingly, Mrs. Hawk cannot equitably claim a lien on the policies or their proceeds as a mechanism to secure payment of benefits under the Retirement Agreement.[14]

---

[14]Mrs. Hawk cited Caldwell v. Armstrong, 342 F.2d 485 (10th Cir. 1965), in support of her claim to an equitable lien.  In Caldwell, however, a state court had ordered the debtor

## V.      Conclusion

Because Hale had a "lawful and substantial economic interest in having the life, health, or bodily safety" of Mr. Hawk continue, and because Mr. Hawk was a director, employee and/or a retired employee of Hale until the date of his death, Hale's insurable interest in the life of Mr. Hawk did not terminate prior to his death, and therefore no obligation to offer or tender the policies to Mr. Hawk under Section 3604(A)(2) arose.  Mr. Hawk had no legal or equitable interest in the policies prior to his death.   Accordingly, F&M's security interest in the policies is superior to any claim by the Hawk Estate. Judgment should be entered in favor of F&M and against the Hawk Estate on Count One of the Amended Complaint and in favor of F&M on F&M's Counterclaim.  Judgment should also be entered in favor of F&M and against the Mrs. Hawk on the equitable lien claim asserted in Count Two of the Amended Complaint.

Pursuant to Bankruptcy Rule 7054 and Rule 54(b) of the Federal Rules of Civil Procedure, the Court concludes that notwithstanding that the claims by and against other parties to this litigation have not been adjudicated, there is no just reason to delay entry of

---

to pay a judgment to his ex-wife in a divorce decree, and further ordered the debtor to liquidate a life insurance policy and pay his ex-wife from the proceeds, and in the event that the debtor failed to do so, the decree was to operate as an assignment of the policy to the ex-wife to the extent of her judgment. Id. at 487-88. The Tenth Circuit concluded that the self-executing assignment of the policy by the state court created an equitable lien in the policy and its proceeds in favor of the ex-wife. Id. at 490.  In Caldwell, the divorce court had unambiguously required the payment of the judgment from the policy proceeds.

In contrast, the parties to the Retirement Agreement in this case unambiguously acknowledged that any policies that Hale might acquire to fund the Retirement Agreement **shall not** be considered security for the payment of benefits to Mr. Hawk or to his heirs, and that claims under the Retirement Agreement would be unsecured claims.

a final judgment in favor of F&M.  Thus, a separate judgment in favor of F&M will be entered contemporaneously with this Memorandum Opinion.

**SO ORDERED** this 8th day of December, 2006.

DANA L. RASURE, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT